UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT CABRERA, ) | 1:09-cv-01543 AWI MJS HC |
| ) | |
| Petitioner, ) | FINDINGS AND RECOMMENDATION |
| ) | REGARDING PETITION FOR WRIT OF |
| v. ) | HABEAS CORPUS |
| ) | |
| KATHLEEN ALLISON, Warden, et al., ) | |
| ) | |
| Respondents. ) | |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented by Seth N. O'Dell, Esq. Respondent[1] is represented in this action by Brook Bennigson, Esq., of the Office of the Attorney General for the State of California.

I.  **PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on May 24, 2006, of second degree robbery and attempted second degree robbery. (CT[2] at 371-72, Lodged Doc. 17.) The trial court also found true allegations

---

[1] Respondent has notified the Court that Petitioner has been transferred to California Substance Abuse Treatment Facility where Kathleen Allison serves as the acting warden. The Court shall substitute Ms. Allison as Respondent pursuant to Federal Rule of Civil Procedure 25(d).

[2] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent with his response.

1 that Petitioner had had prior serious felony convictions which qualified as "strikes" under
2 California's "Three Strikes" law. On November 7, 2006, Petitioner was sentenced to serve a
3 term of fifty (50) years to life in state prison. (Id.)

4     Petitioner timely appealed to the California Court of Appeal, Fifth Appellate District. On
5 April 3, 2008, the judgment was affirmed in a reasoned opinion. (Lodged Doc. 7.) Petitioner
6 then filed a petition for review in the California Supreme Court. (Lodged Doc. 8.) On June 11,
7 2008, the petition was summarily denied. (Lodged Doc. 9.) Petitioner did not file any collateral
8 post-conviction appeals.

9     On August 28, 2009, Petitioner filed the instant federal habeas petition. (Pet., ECF No.
10 1.) Petitioner raised a single ground for relief, specifically, that jury misconduct deprived
11 Petitioner of his Sixth Amendment right to a fair and impartial jury. (Id. at 4.) Respondent filed
12 an answer on July 9, 2010, and Petitioner filed a traverse on August 6, 2010. (Answer &
13 Traverse, ECF Nos. 17, 20.)

14 **II.      FACTUAL BACKGROUND**[3]

15     In the early morning hours of November 26, 2005, Pablo Gama and his cousin Julio Nevel had just left Club Extreme and were walking to their car.[4]
16 There were four individuals standing by a PT Cruiser automobile, including Gilbert and Jose. Gilbert and Jose approached Gama and Nevel. Gilbert
17 demanded their wallets. As he did so, he had his hand in his pants simulating that he had a weapon. Nevel got out his wallet and Gilbert slapped it out of his
18 hand. Gama said he would not give the defendants anything. After Gama said this, Jose punched him in the face. Gama still did not give up his wallet.

19
20     Gama saw a narcotics officer's vehicle pass by. He flagged down the officer. As Gama was flagging down the officer, Gilbert said to Nevel, "let's work
21 something out." Gilbert asked Nevel to tell the officer that the person who took his wallet ran off; in return Gilbert would return Nevel's wallet.

22     Nevel's wallet was now under the PT Cruiser. Gilbert told Nevel to pick up his wallet. Nevel refused and told Gilbert to pick it up. Gilbert got the wallet
23 from under the car and gave it to Nevel.

24     Bakersfield police officer David Chase was driving in front of Club Extreme when he was flagged down by an individual. This individual stated he
25 and another individual had been robbed by some other individuals who were still

---

27 [3] The factual background is taken from the opinion of the state appellate court and is presumed correct. 28 U.S.C. § 2254(e)(1).

28 [4] Club Extreme was also know as La Movida.

present. Officer Chase asked for backup officers. Chase detained everyone in the area who was involved. He detained three people who were pointed out as being involved in the robbery. Gilbert and Jose were two of those individuals.

Defense

Natalie Vargas, Erica Coronado, and Sabrina Aguirre testified that they were with Gilbert at Riley's, a bar in Kern County, until about 1:30 a.m. on November 26, 2005. Natalie and Erica left in their own cars. Sabrina drove Gilbert to his house and dropped him off. She left and went to her home.

Thomas Martinez, the third individual arrested with Jose and Gilbert as a participant in the robbery, testified that he went with Jose to Club Extreme on the evening of November 25, 2006. Martinez was driving his cousin's PT Cruiser. They stayed at the club until closing, approximately 1:50 a.m. on November 26, 2005. Martinez walked toward his car and was talking to women. Jose said he was going to call Gilbert for a ride because Martinez had been drinking and should not be driving. Martinez got in the car and waited. He saw the police arrest Jose and then, when Gilbert arrived, he (Gilbert) was put in handcuffs. Martinez was asked to get out of the car. He was also arrested.

Jose Onsurez received a call from Gilbert between 1:30 and 2:00 a.m. on November 26, 2005. Onsurez was asleep. Gilbert asked Onsurez to take him to pick up Jose from Club Extreme. Onsurez agreed to do so and picked up Gilbert. As they approached Club Extreme, Onsurez saw a police officer talking to Jose. Gilbert got out of the car to see what was going on with Jose. Onsurez drove around the block. He saw that Gilbert was being searched. Onsurez left.

Defendant Jose testified on his own behalf. He said he went to Club Extreme with Thomas Martinez in a PT Cruiser driven by Martinez. He left the club about 1:40 a.m. and had agreed to call for a ride because he had alcohol in his system.

He tried calling Gilbert, but Gilbert's telephone did not work properly. Gilbert called Jose back, and Jose asked Gilbert to call Onsurez. Gilbert called Jose back and said Onsurez was bringing him to the club.

As Jose was walking, Gama spit on him. Jose told Gama to watch where he was spitting. Gama and Nevel approached Jose. One of them had his hands in his pockets and the other one was swinging his hands around. Jose told them not to approach him like that. When they got close, Jose threw a punch at Gama. Gama and Nevel walked away. Jose went and talked to some women. Jose saw Gama flagging someone down. Jose was then hit with a spotlight and told to turn around and put his hands on the wall. Police officers searched him and asked him where the wallet was. He was told that he was being arrested for a robbery.

Telephone bills were produced showing calls to and from Gilbert from the telephone Jose claimed was his, although the telephone bill was in name of Jose's father.

The owner of Club Extreme testified that he had video surveillance cameras covering areas outside his club. These tapes were erased every two weeks. The police never asked him for tapes from the evening of November 26, 2005.

> Rebuttal
>
> Bakersfield police officer Eric South testified that he was dispatched to the report of a robbery at Club Extreme. He interviewed Jose. Jose said he had no involvement whatsoever with a robbery, had no contact with the two victims, and did not know the two victims. He did not say anything about someone spitting on him.

(Lodged Doc. 7 at 2-4.) (footnotes in original.)

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

### B.    Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n. 7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable

>     determination of the facts in light of the evidence presented in the
>     State court proceeding.

28 U.S.C. § 2254(d).

### 1. Contrary to or an Unreasonable Application of Federal Law

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06. "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the Court further stresses that "an unreasonable application of federal law is different from an *incorrect* application of federal law." 131 S. Ct. 770, 785 (2011), (citing Williams, 529 U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

1 Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1419 (2009), quoted by Richter, 131
2 S. Ct. at 786.

### 2. Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the "look through" presumption. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion,"does not require that there be an opinion from the state court explaining the state court's reasoning." Harrington, 131 S. Ct. at 784-85. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Harrington instructs that whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75). AEDPA "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Id. To put it yet another way:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 786-87. The Court then explains the rationale for this rule, i.e., "that state courts are the

principal forum for asserting constitutional challenges to state convictions." Id. at 787. It follows from this consideration that § 2254(d) "complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for later federal habeas proceedings." Id. (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

### 3. Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, where a habeas petition governed by AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002); Musalin v. Lamarque, 555 F.3d at 834.

## IV.   REVIEW OF PETITION

### A.   Jury Misconduct

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). "Evidence developed against a defendant must come from the witness stand." Fields v. Brown, 503 F.3d 755, 779 (9th Cir. 2007). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Smith v. Phillips, 455 U.S. 209, 217 (1982). A prospective juror must be removed for cause if his views would prevent or substantially impair the performance of his duties as a juror. See Wainwright v. Witt, 469 U.S. 412, 424 (1985) (judge may strike for cause a potential juror

whose views regarding the death penalty "would prevent or substantially impair the performance of his duties as a juror."). Jurors are objectionable if they have formed such deep and strong impressions that they will not listen to testimony with an open mind. Irvin, 366 U.S. at 722 n.3. "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations omitted); Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc).

To obtain a new trial on account of a juror's failure to disclose information during voir dire, "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984).[5] As the court explained in Dyer, it follows from McDonough that "an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality." Dyer, 151 F.3d at 973 (citing McDonough, 464 U.S. at 555-56).

Courts analyze juror bias under two theories: actual and implied bias. The determination whether a juror was actually biased is a question of fact. See Dyer, 151 F.3d at 973. Because of the importance of such qualities as demeanor and inflection in determining credibility, the "findings of state trial and appellate courts on juror impartiality deserve a high measure of deference." Tinsley, 895 F.2d at 525 (internal quotation and citation omitted). Even if a juror's responses on voir dire do not indicate actual bias, bias can be implied, but only in extreme cases.[6] Id. at 527.

---

[5] Although McDonough was a civil case, the same standard is used in criminal cases. Tinsley v. Borg, 895 F.2d at 524.

[6] The Ninth Circuit has analyzed juror bias under a theory of implied bias in exceptional circumstances. See, e.g., Estrada v. Scribner, 512 F.3d 1227, 1239-40 (9th Cir. 2008) (identifying four scenarios in which bias might be implied). The facts in this case do not present exceptional circumstances that warrant the finding of implied bias. See id.; Fields, 503 F.3d at 768, ("our court has inferred and presumed bias on rare occasions."); Dyer, 151 F.3d at 981-82 (examples of extreme circumstances include a situation where a juror turned out to be a witness to the crime, or if a juror turned out to be the prosecutor's brother).

1.  Relevant State Court Decision

On Petitioner's direct appeal, the Fifth District Court of Appeal denied Petitioner's claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. Based on the "look-though" doctrine of Ylst v. Nunnemaker, the Fifth District Court of Appeal decision is considered to be adapted by the California Supreme Court and the operative state court decision for this claim. 501 U.S. at 803. In the decision the state court found that jury misconduct occurred, but was harmless:

> Defendants jointly filed a motion for new trial based on juror misconduct. Their motion was supported by a declaration from juror No. 653114. In her declaration, No. 653114 stated she offered the declaration out of her concern that defendants did not get a fair trial as a result of activities of certain jurors. She declared she heard other jurors say things to "the effect: 'Well this isn't going to take too long.'" In addition, she said jurors made comments such as, "'He is still in jail. He didn't make bail, he must have done something." Comments about defendants' need for private counsel were made "to the effect of: 'If they are so innocent why did they have to hire attorneys as opposed to getting free attorneys through the Courts' and 'It doesn't matter how we vote, those lawyers were still going to get paid. So what is the difference.'"
>
> No. 653114 stated the foreperson was surprised he was selected because he had been the victim of a robbery. She claimed he stated something "to the effect of: 'Why would I vote not guilty?'"
>
> In addition to the above comments, No. 653114 asserted punishment was discussed by the jury. She said comments about punishment were met with responses "to the effect of: 'Well even if we vote guilty, the judge could just give them the time served, or probation, or at the most one to two years. It doesn't mean that much if we go guilty.'"
>
> Defendants claimed that No. 653114's declaration showed three areas of misconduct: (1) jurors prejudged the case prior to its submission to them; (2) the foreperson concealed his bias against defendants during jury selection; and, finally, (3) the jurors considered inappropriate facts and circumstances in arriving at their decision.
>
> Based on the above declaration and motion for new trial, the trial court sent letters to all of the jurors asking if they had an objection to disclosure of their personal information so the parties could contact them. Several jurors filed objections. The parties were given access to addresses and telephone numbers of the jurors who did not object to the disclosure of their personal information.
>
> The People filed opposition to the motion for new trial. They filed several declarations from jurors, as well as a supplemental declaration from No. 653114. In her new declaration No. 653114 stated she now believes defendants received a fair trial. In addition, she stated she believed that punishment was discussed in the deliberation room after the verdict forms had been signed and while the

jurors were waiting for the judge to call them into the courtroom.

The jury foreperson, No. 833821, filed a declaration stating the jurors were frustrated by delays but he did not hear any comments similar to the comment claimed by No. 653114 regarding how long the trial was going to take. No. 833821 stated a juror spoke about the defendants' custody status after the verdict was read but the jurors had been sent back to the jury room to fill our new verdict forms.[7] The foreperson declared that someone might have mentioned that "the defendant" had a court appointed attorney, but no one said anything about the lawyers being paid, etc., as claimed by No. 653114. No. 833821 stated he was surprised he was left on the jury but his experience as a robbery victim did not influence his ability to be objective and he never said, "Why would I not vote guilty?" The foreperson stated some jurors were concerned about punishment and he participated in a brief conversation about punishment, but he explained to the other jurors that the jury needed to worry about only the guilt portion.

No. 673635 filed a declaration. She stated she did not hear any of the statements attributed to jurors by No. 653114 with the exception that some juror mentioned defendants' custody status after the jurors were sent back to the jury room to sign corrected verdict forms, after Gilbert asked the bailiff to take him back to jail. Another juror also mentioned that "the defendant" had a court appointed attorney.

No. 780797 filed a declaration similar to No. 673635's. She agreed that jurors spoke about the custody of defendants after the jurors were sent back to the jury room and during this same period of time one or more jurors mentioned the defendants had private attorneys. She said they did not discuss punishment.

No. 739970 stated she heard one juror say, "this will not take long." She also heard a juror comment that one defendant was not able to leave for lunch and his case might be his third strike. She recalled one juror mentioning the defendants had private attorneys.

No. 780441 stated she heard a juror say that this was not going to take long. She heard one juror, a female African-American juror, stating the defendant must have done something wrong, otherwise the jury would not be there.

The court denied the motion for new trial based on jury misconduct. It stated, "I do not find that the jury engaged in any misconduct, an alleged prejudging of the case, concealing bias, or find any evidence of prejudicial facts involving the reaching of the decision, and find that there is no evidence to show that even if there was some degree of misconduct, that that in any way prejudiced the result as reached by the jury in this case. In other words, there is no evidence to show that there was a substantial likelihood that any jurors' vote was influenced by any claims of misconduct.

"And also the overwhelming strength of the People's case is another factor which demonstrates that were there misconduct, if any, it was not

---

[7] The forms as to Gilbert were correct. After the verdict was read for Gilbert, he said, "Take me back to jail." The court then discovered the verdict forms for Jose also contained Gilbert's name. The court sent the jury back to the jury room to sign new verdict forms containing only Jose's name.

prejudicial.

"Therefore, based on the totality of the evidence, the declarations received, the points and authorities discussed and read by counsel and the Court, and our review of our trial notes, I find that there is insufficient evidence to grant the motion for new trial. Therefore, it's respectfully denied."

"When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible. [Citation.] If the evidence is admissible, the court must then consider whether the facts establish misconduct. [Citation.] Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial. [Citations.] A trial court has broad discretion in ruling on each of these questions and its rulings will not be disturbed absent a clear abuse of discretion. [Citation.]" (People v. Perez (1992) 4 Cal.App.4th 893, 906.)

Defendants argue the trial court erred when it denied their motion for new trial based on juror misconduct. They assert the comment about the matter not going to take long demonstrated that jurors prejudged the case. Next, they claim the evidence showed that No. 833821 prejudged the case when he stated, "Why would I not vote guilty?" Defendants contend prejudicial misconduct occurred because the jury considered punishment.

With the exception of the discussion of punishment by the jury, we find that no misconduct occurred. The comment that this case was not going to take long does not demonstrate a prejudgment by the jury; it shows only that the juror(s) thought the trial presentation was not going to take long. The declaration by No. 653114 that this statement was made did not provide any context except that others, including herself, expressed a desire for the trial to be over with. Given the facts that the case involved a very brief event resulting in only two charges, with eyewitnesses, and with the police on the scene almost immediately, such a comment by itself does not demonstrate prejudgment and merely shows an assessment of the length of the trial.

The asserted question by one juror why defendants were there if they had not done something wrong, while misconduct, had no effect because that juror was dismissed from the panel during the trial before the jury began deliberating.

The trial court did not have the jurors testify at the hearing, but held the hearing based on the affidavits.[8] The affidavits were in conflict on the question of whether the foreperson, No. 833821, said, "Why would I vote not guilty?" No. 653114 said the foreperson made such a statement, No. 833821 denied making such a statement. No. 833821 stated during voir dire that he had been the victim of a robbery at gunpoint. He also stated it would not affect his ability to be fair and impartial. Thus, No. 833821, was forthcoming during voir dire about his prior experience. For the purposes of argument, we will accept No. 653114's assertion that No. 833821 made such a statement. Again No. 653114's assertion is not made in any context. It is an ambiguous type of question and may have been made during deliberations when such a comment may have been rationally related to a discussion of the evidence and No. 833821's determination during deliberations that he would not at that point vote not guilty. Based on the ambiguity of the comment and the dearth of evidence to give it any

---

[8] We note the defendants did not request a hearing with testimony from the jurors.

context concerning the proceedings, the trial court could correctly find that this comment did not constitute misconduct.

As previously set forth, the jury returned their verdicts to the courtroom. The court read the guilty verdicts concerning Gilbert. Gilbert responded by asking the bailiff to take him back to jail. The trial court then observed that the forms relating to Jose also contained Gilbert's name. The court sent the jury back to the deliberation room and had them wait for new forms to be prepared. The new forms were sent in and signed by the foreperson, finding Jose guilty.

It was agreed by several of the jurors that punishment was discussed, including a comment that this might be "the defendant's" third strike. This was misconduct. Several jurors stated that these discussions occurred during the interim time after they had returned their initial verdicts and were waiting in the jury room to sign the corrected verdict forms for Jose. Other references to punishment in the declarations were not pinpointed as to time. Thus it was not contradicted that discussions of punishment occurred after the verdicts had been determined. In addition, the foreperson stated that punishment was discussed but he told the jurors not to concern themselves with punishment. The presumption of prejudice from jury misconduct "'may be rebutted … by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm.' [Citations.]" (People v. Leonard (2007) 40 Cal.4th 1370, 1425.) The timing of the discussion(s) and the foreperson's admonishment to the jurors to not concern themselves with punishment were sufficient to rebut the presumption of prejudice.

The trial court did not err in denying the motion for new trial.

(Lodged Doc. 3 at 10-15.)

2.  Argument and Analysis

Petitioner raised two separate claims of juror misconduct in the present petition. First Petitioner asserts that the jury foreman failed to disclose his prosecutorial bias. Second, Petitioner asserts that the jury improperly discussed punishment during deliberation. The claims shall be addressed in turn.

a.  Juror Bias

Petitioner claims that the jury foreman failed to disclose his bias. He bases his allegation on the foreman's expression of surprise that he had been selected despite the fact that he had been the victim of a robbery and based on his statement "Why would I vote not guilty?".[9]

---

[9] It is noted that there is a factual dispute as to whether the jury foreman stated, "Why would I vote not guilty?" For the purpose of this analysis, the Court shall assume that the statement was made.

> To justify a new trial based on a claim of juror bias, [Petitioner] must demonstrate that a dishonest answer was given on voir dire to a material question and that the correct response would have provided a valid basis for a challenge for cause, see McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984), or that his right to an impartial jury, guaranteed by the Sixth and Fourteenth Amendments, was otherwise violated by actual or implied juror bias, see Fields, 503 F.3d at 766-68; see also Morgan v. Illinois, 504 U.S. 719, 726-27, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992); Remmer v. United States, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654, 1954-1 C.B. 146 (1954). [Petitioner] must also surmount the "presumption of correctness" that we afford to the state courts' factual conclusions regarding the possibility of prejudicial misconduct. 28 U.S.C. § 2254(e)(1); see Thompson v. Keohane, 516 U.S. 99, 111, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995) (noting requirement that presumptive weight be accorded to a trial court's resolution of factual issues, including juror impartiality, because the resolution of such issues "depends heavily on the trial court's appraisal of witness credibility and demeanor").

Hamilton v. Ayers, 583 F.3d 1100, 1107 (9th Cir. 2009).

In finding that no misconduct occurred with respect to the claim of bias of the jury foreperson, the California Court of Appeal held that the foreperson was forthcoming during voir dire regarding being a victim of a robbery, and no context was given for when the statement "Why would I vote not guilty?" was made, and may have been made during deliberations when such a comment would be rationally related to a discussion of the evidence. Based on the ambiguity of the comment and lack of evidence providing the context of when the statement was made, the court affirmed the decision of the trial court in denying the motion for new trial.

The state court decision was not an unreasonable application of clearly established federal law. The juror made comments that he was surprised that he was left on the jury for a robbery trial having been the victim of a robbery. However, the juror stated that he could still be impartial despite the incident, and Petitioner did not challenge his presence on the jury despite his past experience. Finally, when empaneled he made comment to other jurors that he was surprised that he was left on the jury.

The jurors comment that he was surprised that he was left on the jury does not infer that the juror was biased. Despite his statement that he could be impartial, it is reasonable to believe that the juror could harbor some level of subconscious bias, and that defense counsel would move to dismiss the juror despite his good faith statement of impartiality. The statement only illustrates the juror's surprise.

The state court's determination that the statement "Why would I vote not guilty?" without additional context does not conclusively show bias is also reasonable. Such a statement could be made during the deliberation and in regard to weighing the evidence. The juror does not state that he would never vote to acquit or that he would not be impartial. The phrase is open to interpretation and while it could be construed to show bias, it just as well could be construed as neutral comment made during deliberations.

Despite the fact that the juror did not make overt comments of bias, the juror's implied bias could still violate Petitioner's constitutional rights. In Dyer v. Calderon, implied bias was found when a juror concealed a major crime that the juror knew was similar to the crime at trial, specifically that the juror did not disclose that her brother had been murdered. 151 F.3d 970, 979 (9th Cir. 1998); Hamilton v. Ayers, 583 F.3d 1100, 1108 (9th Cir. 2009). On the other hand, where a juror disclosed a past assault of his wife and stated he could be impartial, no implied bias was found. Fields v. Brown, 503 F.3d 755, 764 (9th Cir. 2007).

The present case is like Fields and unlike Dyer. The juror disclosed that he was the victim of a robbery. The Ninth Circuit has implied bias in those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." Fields, 503 F.3d at 770. While the juror's experience being a victim was likely traumatic, it was not such an extreme or extraordinary event as to infer implied bias on his behalf. The conclusion of the state court that no misconduct occurred when the jury foreman did not disclose his alleged bias is not contrary or an unreasonable application of United States Supreme Court authority. Accordingly, Petitioner is not entitled to relief on this claim.

### b. Discussion of Sentencing by the Jury

Petitioner also asserts that the jurors discussed punishment during deliberation, including a comment that the conviction may serve as his third strike under the California

Three Strikes Law.[10] The state court considered the discussion to be juror misconduct but that there was no substantial likelihood of harm based on statements of several jurors who explained that the discussion occurred after the initial verdicts were made and the jurors were waiting for corrected verdict forms, and that the foreperson admonished the jury to not concern themselves with punishment.

> Fundamental to our judicial system's administration of justice is a fair and impartial jury. United States v. Bagnariol, 665 F.2d 877, 884 (9th Cir. 1981). A jury should reach a verdict that is based solely upon the evidence admitted at trial. Id. A juror's communication of extraneous information implicates the Confrontation Clause. Sassounian v. Roe, 230 F.3d 1097, 1108 (9th Cir. 2000). "The juror in effect becomes an unsworn witness, not subject to confrontation or cross examination." Id. If a court determines that a juror has improperly brought extraneous information to the jury's attention, the inquiry must then focus on whether "there is a reasonable possibility that the extraneous information could have affected the verdict." United States v. Keating, 147 F.3d 895, 900 (1998). This inquiry is an objective one: "we need not ascertain whether the extraneous information actually influenced any specific juror." Id. at 901-02.

United States v. Ruiz Montes, 628 F.3d 1183, 1187 (9th Cir. Cal. 2011)

"On collateral review, trial errors -- such as extraneous information that was considered by the jury -- are generally subject to a harmless error analysis, namely, whether the error had substantial and injurious effect or influence in determining the jury's verdict." Estrada v. Scribner, 512 F.3d 1227, 1235 (9th Cir. 2008) (citations and internal quotations omitted). The Ninth Circuit proceeded to list five factors to review when determining if a defendant suffered prejudice:

> We look to the following factors to determine whether a defendant has suffered prejudice from juror misconduct:
>
> (1) whether the material was actually received, and if so, how;
>
> (2) the length of time it was available to the jury;
>
> (3) the extent to which the juror discussed and considered it;
>
> (4) whether the material was introduced before a verdict was reached, and if so

---

[10] As with Petitioner's other claim, there is a dispute as to whether the statements were made, and when they were made. Furthermore, the juror reporting that improper discussion occurred provided a later declaration that the discussion occurred after the initial verdict forms were filled out. (See Lodged Doc. 17, CT 305-06, 349.) For the purpose of this analysis, this Court shall assume that the statements were made during deliberations.

at what point in the deliberations; and

(5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

Id. at 1238. The evidence regarding whether the conviction would be Petitioner's third strike appears to have been overheard by a juror during lunch. (CT at 354.) There was possibly also a discussion that if Petitioner was convicted he would be sentenced for at most one to two years. (CT 305-06.) The descriptions of the discussion of punishment was very brief. (CT 350-51.) Also, based on the declarations of several jurors the initial vote was 10-2 or 11-1 for guilt. (CT 349-55.) Finally, the foreperson admonished the jury from considering Petitioner's potential punishment. (CT 351.)

In Estrada, the Ninth Circuit found that a discussion of punishment, specifically ensuring that the petitioner received a long sentence to prevent him from committing another murder, was not prejudicial as the jury reached its verdict for reasons unrelated to the improper sentencing discussions and in light of other evidence rebutting a presumption of prejudice. 512 F.3d at 1239.

On the other hand, in Sassounian, the Ninth Circuit granted habeas relief based on the introduction of extraneous evidence as it substantially affected the outcome of the jury. 230 F.3d 1009-1012. The jurors were introduced inadmissible evidence regarding a phone call that related to the petitioner's motive to commit the murder. (Id.) Of special note was the timing of when the information was produced. After fifteen days of deliberations, the jury asked the court what to do if it could not reach a verdict regarding special circumstances. (Id.) With the introduction of the new evidence, the jury reached a verdict on the special circumstance in little more than an hour. The Ninth Circuit found that the lengthy deliberations before the misconduct, and quick verdict after, strongly suggest prejudice. (Id.)

The Court finds this case to be more analogous to Estrada v. Scribner. There is no evidence that jurors were swayed by and changed their vote based on the evidence. There is no showing that the extraneous evidence was provided shortly before a verdict was reached or that lengthy deliberations proceeded a discussion of the evidence. Furthermore, at least

one juror claimed to have admonished the other jurors to focus on Petitioner's guilt. (CT 351.)

The state court found that the potential timing of the discussion of punishment during a time after the verdict was reached and new forms being prepared and the foreperson's admonishment to the jurors to not concern themselves with punishment were sufficient to rebut the presumption of prejudice. (Lodged Doc. 3 at 15.) The Court finds that the California court's rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. Further, the state decision was not based on an unreasonable determination of the facts. No relief is warranted for Petitioner's allegations of juror misconduct. Thus, habeas relief is not warranted.

## V.     RECOMMENDATION

Accordingly, it is hereby recommended that the petition for a writ of habeas corpus be DENIED with prejudice. It is further recommended that the Clerk of Court be directed to enter judgment.

This Findings and Recommendation is submitted to the assigned District Judge, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    June 29, 2012                    /s/ *Michael J. Seng*
                                           UNITED STATES MAGISTRATE JUDGE

U.S. District Court
E. D. California
-17-